IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

      v.                                    Criminal No. 3:25-cr-40

OMAR C. CHAMBERS,

      Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Omar C. Chambers' Motion to Suppress (the "Motion to Suppress" or "Motion"). (ECF No. 14.)[1] In the Motion, Mr. Chambers moves to suppress cocaine recovered from his car during a search conducted by Virginia State Police Trooper Thomas Moade ("Trooper Moade"). (ECF No. 14, at 1, 5.)

On April 17, 2025, Mr. Chambers filed the Motion. (ECF No. 14.) The United States responded, (ECF No. 15), and Mr. Chambers replied, (ECF No. 18). On July 17, 2025, the Court held a hearing concerning Mr. Chambers' Motion. (ECF No. 23.) This matter is ripe for disposition. For the reasons articulated below, the Court will deny the Motion to Suppress.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

### I.  Factual Findings and Procedural Background

A.    **Factual Findings[2]**

1.    **Trooper Moade Pulls Mr. Chambers Over for a Traffic Infraction**

On the afternoon of December 10, 2024, Trooper Moade was assigned to patrol Interstate 95 in an unmarked patrol vehicle.  (ECF No. 24, at 5:6–14.)[3]  While patrolling, Trooper Moade wore his Virginia State Police uniform and a bulletproof vest.  (ECF No. 24, at 5:17–19, 38:3–6.) Trooper Moade observed a white, 2023 Chevrolet Malibu following a black SUV closely in the right-hand lane.  (ECF No. 24, at 6:20–7:2.)  Trooper Moade determined that the white Malibu followed the black SUV too closely and pulled the white Malibu over, initiating a traffic stop. (ECF No. 24, at 6:20–7:5; *see also* ECF No. 15-1, at 15:50:00–15:54:00.)  When Trooper Moade initiated the traffic stop, it was daytime.  (ECF No. 24, at 64:16–19.)

---

[2] The court bases its factual determinations on dash cam footage recorded within Trooper Moade's patrol vehicle, (ECF Nos. 14-1, 14-2, 15-1, 15-2), the testimony of Trooper Moade during the July 17, 2025 hearing, (ECF No. 24), the exhibits admitted at the hearing, and the exhibits accompanying the Motion and the opposing memorandum.

ECF No. 15-1 is dash cam footage facing the exterior of Trooper Moade's patrol vehicle, capturing the perspective of one looking out through the windshield of the vehicle from the inside. ECF No. 15-2 is dash cam footage facing the interior of Trooper Moade's patrol vehicle, capturing footage of the driver and front passenger seats.

Mr. Chambers also provided a copy of the exterior and interior dash cam footage. (ECF Nos. 14-1, 14-2.)  Mr. Chambers' footage is identical to that of the United States, except that it contains footage from well after Mr. Chambers' arrest, capturing the empty patrol vehicle. Because Mr. Chambers' video does not include any information in addition to footage in the United States' Exhibits, the Court cites to the United States' footage. (ECF Nos. 15-1, 15-2.)

[3] All of the Court's transcript citations refer to the transcript of the suppression hearing. (ECF No. 24.)

Trooper Moade exited his patrol vehicle and approached the white Malibu's front passenger seat window. (ECF No. 15-1, at 15:54:10–15:54:16.) Mr. Chambers,[4] the driver of the white Malibu, rolled down the passenger-side window and spoke with Trooper Moade. (ECF No. 15-1, at 15:54:10–15:55:35.) Trooper Moade "introduced [himself and] let [Mr. Chambers] know that the stop was being audibly and visually recorded."[5] (ECF No. 24, at 13:9–10.) Trooper Moade then asked Mr. Chambers for his driver's license and registration. (ECF No. 24, at 13:10–11.) Mr. Chambers provided Trooper Moade with a Pennsylvania driver's license and a rental agreement for the white Malibu. (ECF No. 24, at 13:15–17, 16:11–13.) While examining the driver's license and rental agreement, Trooper Moade "noticed that a third party had rented the vehicle that was not inside of the vehicle." (ECF No 24, at 16:18–19.) Trooper Moade asked Mr. Chambers who the third party was that had rented the vehicle, and Mr. Chambers explained that his cousin rented it. (ECF No. 24, at 16:20–25.) Trooper Moade told Mr. Chambers that he was likely going to issue him a warning for his traffic infraction. (ECF No. 24, at 17:1–3.)

###    2.    Trooper Moade Asks Mr. Chambers to Accompany him to his Patrol Vehicle

After explaining that Mr. Chambers would receive a warning, Trooper Moade asked Mr. Chambers to accompany him to the patrol vehicle. Mr. Chambers got out of his car while

---

[4] Mr. Chambers is 45 years old and is employed as a chef. (ECF No. 24, at 79:13–22.) He emigrated to the United States from Jamaica in 2019. (ECF No. 24, at 27:8–29:1.)

[5] Once Trooper Moade exited his patrol car and walked to Mr. Chambers' vehicle, the exterior dash cam was unable to capture any audio of their interaction. Trooper Moade eventually requested that Mr. Chambers accompany him to his patrol car. When Trooper Moade and Mr. Chambers returned to the patrol car, the interior dash cam captured audio of their interaction. (*See generally* ECF No. 15-1, at 15:54:00–15:56:14 (capturing Trooper Moade's exit from his patrol vehicle until Trooper Moade and Mr. Chambers returned to the patrol vehicle).) As a result, the Court cites Trooper Moade's testimony at the July 17, 2025 hearing as the best account of his interaction with Mr. Chambers while the dash cam was unable to capture audio.

Trooper Moade stood facing traffic behind the car.  Trooper Moade testified at the hearing that

he asked Mr. Chambers whether he had any weapons on his person.  Mr. Chambers responded

that he had a knife, which Trooper Moade asked him to return to his car.  Mr. Chambers walked

back to his car alone, left the knife in his car, and approached the patrol vehicle.  (ECF No. 24, at

18:4–19.)  The dash cam video does not capture the audio of this interaction, but it is consistent

with Trooper Moade's account.  (ECF No. 15-1, at 15:55:43–15:56:14.)

Trooper Moade remained behind the car while Mr. Chambers returned his knife to the

car.  Mr. Chambers returned, Trooper Moade pointed to the passenger door of the car, and each

walked separately to the patrol vehicle.  Mr. Chambers entered the patrol vehicle's front

passenger seat while Trooper Moade entered the driver's seat.[6]  (ECF No. 24, at 17:4–19; *see

also* ECF No. 15-1, at 15:55:43–15:56:14.)  Trooper Moade testified that the doors to the patrol

car remained unlocked throughout the remainder of their interaction.  (ECF No. 24, at 19:13–

20:1.)  No locking sound is audible in the dash cam video.  A police dog sat in the backseat of

the patrol vehicle with barriers between the dog in the back and Mr. Chambers in the passenger

seat.  The dog made no sounds during the entirety of the encounter, nor did it move toward Mr.

Chambers.  Neither Mr. Chambers nor Trooper Moade mentioned the dog.  (ECF No. 15-2, at

15:56:14–16:05:11 (capturing the time from Mr. Chambers' entrance into the patrol vehicle

through his arrest).)

Trooper Moade began entering the information on Mr. Chambers' license and the rental

agreement into various law enforcement databases on the computer in his patrol vehicle.  (ECF

No. 24, at 20:17–21:19.)  While entering this information into the patrol vehicle computer,

---

[6] At this point, Trooper Moade and Mr. Chambers both entered the patrol vehicle, and its
dash cam captured audio of their interaction.

4

Trooper Moade asked Mr. Chambers a variety of questions. He asked Mr. Chambers who rented the white Malibu, where Mr. Chambers was driving to, where Mr. Chambers was from, and whether Mr. Chambers had ever been ticketed or arrested. (ECF No. 15-2, at 15:56:14–16:01:10.) Trooper Moade also noted that Mr. Chambers handed him a Pennsylvania license, but the rental car had an "Arizona tag." (ECF No. 15-2, at 15:56:25–15:56:30.) Toward the end of these questions, Trooper Moade said into his radio, "eighty-four," requesting another officer to respond to the scene with a separate K-9 unit.[7] (ECF No. 24, at 46:11–20; ECF No. 15-2, at 16:00:44.) After entering Mr. Chambers' information into his computer, Trooper Moade learned that Mr. Chambers' license was valid, that he had no outstanding arrest warrants, and that the rental car was not stolen. (ECF No. 24, at 21:20–22:2.)

During this time, Mr. Chambers asked Trooper Moade about the traffic stop. Both car occupants engaged in a conversation that was calm and not confrontational. When Trooper Moade asked where Mr. Chambers was from, Mr. Chambers said Jamaica and asked the Trooper if he had been there. Mr. Chambers asked whether Trooper Moade was from "here." The Trooper said yes. The exchange remained non-confrontational even when Mr. Chambers asked Trooper Moade, "Isn't [the standard length between drivers] supposed to be like 100 feet apart?" Trooper Moade explained that the appropriately safe distance between drivers is one car length for every ten miles per hour. (ECF No. 15-2, at 15:57:43–15:58:04 (capturing Mr. Chambers asking Trooper Moade whether he was correct that one driver should remain at least 100 feet away from another on the road).) The Trooper asked if Mr. Chambers remembered seeing the

---

[7] Trooper Moade already had a police K-9 in the back seat of his patrol vehicle. But because he was "conducting . . . police business, [he] didn't want to extend." Trooper Moade requested the presence of another K-9 unit so that "another K-9 c[ould] come up . . . and run the vehicle while [he was] still figuring out with his license and registration." (ECF No. 24, at 46:16–20.) Neither Trooper Moade nor any other officer made use of their K-9 units.

black SUV in front of him; Mr. Chambers replied that the black SUV "slowed down on me . . . I saw that." (ECF No. 15-2, at 15:58:06–15:58:13.) Mr. Chambers never became angry or defensive during this questioning.

### 3.    Trooper Moade Asks Mr. Chambers Additional Questions Unrelated to the Traffic Stop

Mr. Chambers answered each of Trooper Moade's questions. About seven minutes into the stop, Trooper Moade looked out the driver side window. (ECF No. 15-2, at 16:00:58–16:01:01.) Seconds later, a second car pulled in behind Trooper Moade's patrol vehicle. (ECF No. 15-2, at 16:01:09–16:01:12.) And seconds after that, Trooper Moade told Mr. Chambers that he would only receive a warning. (ECF No. 15-2, at 16:01:13.) Trooper Moade then handed Mr. Chambers his license and rental paperwork. (ECF No. 15-2, at 16:01:16.) As Mr. Chambers took his license and rental paperwork, Trooper Moade asked, "do you mind if I ask you a couple more questions?" (ECF No. 15-2, at 16:01:16.) Mr. Chambers responded, "sure." (ECF No. 15-2, at 16:01:17.) Trooper Moade then asked whether Mr. Chambers was transporting anything illegal, including any drugs or large amounts of money over $10,000. (ECF No. 15-2, at 16:01:18–16:01:29.) Mr. Chambers responded "nah" or "no" to each of these questions. (ECF No. 15-2, at 16:01:18–16:01:29.)

### 4.    Trooper Moade Asks Mr. Chambers to Search the Rental Car

Trooper Moade then asked Mr. Chambers, "can I search your vehicle?" Mr. Chambers responded, "sure." (ECF No. 15-2, at 16:01:29–16:01:31.) Trooper Moade asked Mr. Chambers to "just hang tight right here, okay?", (ECF No. 15-2, at 16:01:31), and Mr. Chambers said, "yeah," (ECF No. 15-2, at 16:01:32). About seven minutes had passed since the encounter began.

Mr. Chambers remained in the patrol vehicle while Trooper Moade got out. At the same time Trooper Moade exited the patrol vehicle, Virginia State Police Trooper Moran entered the patrol vehicle and sat in the driver's seat.[8] (ECF No. 15-2, at 16:01:33–16:01:44.) Trooper Moran engaged Mr. Chambers in conversation, asking Mr. Chambers similar questions to those of Trooper Moade regarding the rental car and Mr. Chambers' travel plans. (ECF No. 15-2, at 16:01:44–16:05:05.) Trooper Moran asked, "do you mind if I look at [the rental paperwork]?" (ECF No. 15-2, at 16:02:40.) Mr. Chambers gave Trooper Moran his papers when asked, and Trooper Moran told Mr. Chambers he was not listed as an authorized driver on the rental car, which was not legal. Trooper Moran returned the paperwork to Mr. Chambers. (ECF No. 15-2, at 16:02:33–16:04:08.) Both Trooper Moran and Mr. Chambers could see Trooper Moade as he walked toward and searched Mr. Chambers' car.

After Trooper Moade got out of the patrol vehicle for the second time, he approached the front passenger seat of the white Malibu and radioed for backup. (ECF No. 24, at 63:10–22, 64:20–24.) Trooper Moade began searching the car, including its trunk, where he found a package wrapped in green cellophane. Trooper Moade believed that the package contained illegal narcotics. He ran back to the patrol vehicle and placed Mr. Chambers under arrest, then continued searching the car and found additional packages. (ECF No. 24, at 33:19–34:25.) Later analysis of these packages determined that "each contained cocaine hydrochloride, a Schedule II controlled substance, with a total net weight of 4,981.02 grams of powder." (ECF

---

[8] Trooper Moade identified at the hearing that both he and Mr. Chambers could see Trooper Moran in the rearview mirrors. (ECF No. 24, at 46:24–47:23.) When Trooper Moade exited the vehicle to begin searching the white Malibu, Trooper Moran was already standing next to the patrol vehicle's driver's-side door. (ECF No. 15-2, at 16:01:34.) Trooper Moran was able to "slide in when [Trooper Moade slid] out." (ECF No. 24, at 48:6–11.)

No. 15, at 9 n.6.)  At some time after Trooper Moade radioed, but before he ultimately placed Mr. Chambers under arrest, additional troopers arrived at the scene.  (ECF No. 24, at 58:5–9.)

From the time Trooper Moade pulled Mr. Chambers over to the time Trooper Moade asked Mr. Chambers for consent to search the rental car, approximately seven minutes passed. (ECF No. 15-2, at 15:54:00–16:01:31.)  Approximately three more minutes passed before Trooper Moade placed Mr. Chambers under arrest.  (ECF No. 15-2, at 16:01:31–16:05:06.) Trooper Moade never obtained a warrant to search the car.  (ECF No. 24, 53:14–17.)

**B.    Procedural Background**

On March 18, 2025, a Grand Jury returned a one-count indictment against Mr. Chambers, charging him with Possession with Intent to Distribute 500 grams or more of Cocaine Hydrochloride in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  (ECF No. 1, at 1.)  An arrest warrant was issued the next day.  (ECF No. 4.)  Mr. Chambers appeared before Magistrate Judge Mark R. Colombell for an initial appearance, (ECF No. 5), and later appeared before this Court for an arraignment, (ECF No. 10).

Mr. Chambers filed the Motion to Suppress.  (ECF No. 14.)  The United States responded.  (ECF No. 15.)  Mr. Chambers filed a Motion for an Extension of Time to Reply, which the Court granted.  (ECF Nos. 16, 17.)  Mr. Chambers replied, (ECF No. 18), and the Court continued this matter under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7), pending resolution of the Motion to Suppress, (ECF No. 19, at 1–2).  The Court has heard the evidence and reviewed briefing, so the matter is ripe for disposition.

**II.  Standard of Review**

"The proponent of a motion to suppress has the burden of establishing that his [or her] own Fourth Amendment rights were violated by the challenged search or seizure."  *Rakas v.*

*Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also United States v. Bowman*, 106 F.4th 293, 300 (4th Cir. 2024) ("[T]he defendant bears the burden of proof on a motion to suppress."). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

### III. Analysis

Mr. Chambers asks the Court to suppress the drugs recovered from the rental car on two grounds. First, Mr. Chambers argues that Trooper Moade impermissibly extended the initial traffic stop by asking Mr. Chambers additional questions unrelated to the traffic stop. (ECF No. 14, at 9–10.) Second, Mr. Chambers argues that he never gave voluntary consent to a search of the rental car. (ECF No. 14, at 11–15.) Mr. Chambers contends that because Trooper Moade exceeded the proper scope of the traffic stop and searched the car without his consent in violation of his Fourth Amendment[9] rights, the cocaine seized from the car should be suppressed.

The Court must deny Mr. Chambers' Motion to Suppress. Based on the dash cam footage and the evidence presented at the Suppression Hearing, the Court concludes that (1) Trooper Moade did not impermissibly extend the scope of the traffic stop by requesting Mr. Chambers' permission to ask additional questions, and (2) Trooper Moade received valid consent to search the rental car.

---

[9] The Fourth Amendment provides, in relevant part:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.

U.S. Const. amend. IV.

### A.      Trooper Moade Had Probable Cause to Detain Mr. Chambers During the Initial Traffic Stop

Neither party denies that Trooper Moade had probable cause to conduct the initial traffic stop.  (ECF No. 14, at 8 ("This motion does not challenge the basis of the traffic stop, which was for the trooper witnessing Mr. Chambers 'following too closely' to the car in front of him on I-95."); ECF No. 15, at 10–11.)  Virginia law prohibits drivers from "follow[ing] another vehicle, trailer, or semitrailer more closely than is reasonable and prudent."  Va. Code § 46.2-816.[10] Because Trooper Moade initiated the traffic after he "noticed that [Mr. Chambers] was following a black SUV too closely" on the highway, (ECF No. 24, at 6:20–7:5), he "had probable cause to stop the car because it was reasonable for him to believe a violation of Virginia law was occurring." *United States v. Johnson*, No. 3:21-cr-29 (MHL), 2022 WL 2373700, at *10 (E.D. Va. June 30, 2022).

Instead, Mr. Chambers "challenges the scope of the traffic stop."  (ECF No. 14, at 8.) Accordingly, the Court next evaluates whether Trooper Moade's actions exceeded the permissible boundaries of that traffic stop.  They did not.

### B.      Trooper Moade Did Not Exceed the Scope of a Permissible Traffic Stop

#### 1.      Legal Standard:  Permissible Scope of a Traffic Stop

Probable cause to believe a traffic violation has occurred does not, by itself, enable an officer to keep an automobile and its passengers stopped indefinitely.  Instead, "[o]bserving a

---

[10] Va. Code § 46.2-816 provides:

The driver of a motor vehicle shall not follow another vehicle, trailer, or semitrailer more closely than is reasonable and prudent, having due regard to the speed of both vehicles and the traffic on, and conditions of, the highway at the time.

Va. Code § 46.2-816.

traffic violation provides sufficient justification for a police officer to detain the offending vehicle for [only] as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citations omitted).  The "traditional incidents of a routine traffic stop" include tasks such as "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants.'" *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (citation omitted).

"[A] legitimate traffic stop may 'become unlawful if it is prolonged beyond the time reasonably required' to complete its initial objectives." *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  "[I]n order 'to extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess reasonable suspicion [of ongoing criminal activity] or receive the driver's consent.'" *Bowman*, 884 F.3d at 210 (quoting *United States v. Williams*, 808 F.3d 238, 245–46 (4th Cir. 2015)); *see Palmer*, 820 F.3d at 649–50.

"Although the maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision, a stop may become unlawful if 'it is prolonged beyond the time reasonably required to complete [its] mission.'" *United States v. Green*, 740 F.3d 275, 280 (4th Cir. 2014) (internal citation omitted) (quoting *Caballes*, 543 U.S. at 407).  "The reasonableness of a stop turns on whether the officer's overall course of action, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." *Id.* (citation omitted).

## 2.    Trooper Moade Engaged in the Traditional Incidents of a Routine Traffic Stop

Mr. Chambers contends that Trooper Moade impermissibly extended the scope of the traffic stop beyond its initial mission. (ECF No. 14, at 8–10.) A review of the evidence establishes otherwise.

After observing Mr. Chambers follow another car too closely, Trooper Moade's traffic stop adhered to its "initial objectives." *Palmer*, 820 F.3d at 649. Upon pulling Mr. Chambers over, Trooper Moade requested Mr. Chambers' license and registration, (ECF No. 24, at 13:6–17); entered the information from Mr. Chambers' license and the rental agreement into various law enforcement databases, (ECF No. 24, at 20:17–21:19); and ultimately decided to give Mr. Chambers a warning, (ECF No. 24, at 28:11–15). These actions constituted the "traditional incidents of a routine traffic stop," *Bowman*, 884 F.3d at 210, and were well within the bounds of the Fourth Amendment.

"The reasonableness of a stop turns on whether the officer's overall course of action, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." *Green*, 740 F.3d at 280 (citation omitted). Trooper Moade clearly pursued the "proper ends of the stop." He examined Mr. Chambers' license and rental paperwork, checked law enforcement databases, and gave Mr. Chambers his license and paperwork back. The traffic stop lasted approximately seven minutes. (ECF No. 15-2, at 15:54:00–16:01:16 (capturing Trooper Moade's initial approach of the white Malibu until Trooper Moade returned Mr. Chambers' license and rental paperwork).) Courts have determined that traffic stops did not exceed their scope even when they lasted far longer than seven minutes. *See, e.g., United States v. Givens*, 923 F. Supp. 2d 803, 809–10 (E.D. Va. 2013) (denying traffic stop exceeded its scope when stop lasted approximately sixteen minutes); *United States v. Perez-Almeida*, No. 3:19-cr-61 (REP),

2019 WL 4023075, at *6–7 (E.D. Va. Aug. 26, 2019) (denying traffic stop exceeded its scope when stop lasted over twenty-nine minutes).

Trooper Moade's request that Mr. Chambers accompany him to his patrol vehicle does not change this conclusion. "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). Mr. Chambers walked to the police car and entered the front passenger seat on his own. Trooper Moade did not tell Mr. Chambers not to return to his car before coming to the police vehicle, nor did he follow him. Although the Trooper waited behind the Malibu to point Mr. Chambers to the passenger door, he walked in the opposite direction to the driver's side door.

Nor did Trooper Moade's questions during the stop regarding Mr. Chambers' travel plans and personal background exceed the scope of the stop. "[P]olice *during the course of a traffic stop* may question a vehicle's occupants on topics unrelated to the traffic infraction . . . as long as the police do not 'extend an otherwise-completed traffic stop in order to conduct' these unrelated investigations." *Bowman*, 884 F.3d at 210 (emphasis in original) (citations omitted). Trooper Moade's unrelated questions did not unduly prolong the traffic stop. Before Trooper Moade asked Mr. Chambers whether he was transporting drugs or money in excess of $10,000, the traffic stop remained within the bounds of the Fourth Amendment.

The parties agree that once Trooper Moade returned Mr. Chambers' license and rental paperwork, the objectives of the traffic stop had been achieved. (ECF No. 14, at 10 ("At this time, the trooper's 'mission' with respect to Mr. Chambers was complete."); ECF No. 15, at 19–20 ("The stop was not extended but rather had ended.").) But Mr. Chambers insists that Trooper

Moade impermissibly extended the scope of the stop at this point by asking Mr. Chambers additional questions once the objectives of the stop had been achieved. (ECF No. 14, at 8–10.) He did not.

### 3.    Legal Standard:  Consensual *Bostick* Encounters

Even if the traffic stop had "ended," (ECF No. 15, at 20), Mr. Chambers could still have been subject to a seizure under the Fourth Amendment.  "[T]he appropriate inquiry for the trial court is whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir. 1992) (citing *Florida v. Bostick*, 501 U.S. 429 (1991)).  If a reasonable person would have felt free to terminate the encounter, "the interaction was a consensual encounter that did not rise to the level of a Fourth Amendment seizure." *Id.*  When a reasonable person would have felt free to terminate an encounter with law enforcement, courts often refer to these circumstances as "*Bostick* encounters" in which no seizure occurred. *See, e.g.*, *United States v. Gooden*, No. 5:06-cr-313, 2007 WL 1875544, at *2 (E.D.N.C. June 27, 2007) (determining that a reasonable person would have felt free to terminate an encounter with a police officer, resulting in a "*Bostick* encounter").  In order to determine whether a *Bostick* encounter occurred, courts must consider the "totality of the circumstances." *Bostick*, 501 U.S. at 437.

"When establishing whether a reasonable person would feel free to leave," the Fourth Circuit has considered a variety of factors reflecting the totality of the circumstances. *United States v. Peters*, 60 F.4th 855, 862–63 (4th Cir. 2023).  Those factors include:

> (i) the number of police officers present; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than

treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant . . . some form of official identification, the officer promptly returned it.

*Id.* (citation omitted).

###    4.    Trooper Moade's Additional Questions Did Not Exceed the Scope of the Traffic Stop Because a Reasonable Person in Mr. Chambers's Position Would Have Felt Free to Terminate the Encounter

After Trooper Moade achieved the objectives of the traffic stop, he asked Mr. Chambers for permission to continue his questioning.  When Mr. Chambers said "sure," Trooper Moade asked Mr. Chambers whether he was transporting any illegal contraband.  Trooper Moade and Mr. Chambers remained in the patrol vehicle throughout this portion of the encounter.

Mr. Chambers contends that, "[u]nder the totality of the circumstances, the trooper's actions amounted to an unreasonable extension of the duration of the stop, requiring reasonable suspicion or Mr. Chambers' consent to do so." (ECF No. 14, at 10.)  The United States responds that "before Trooper Moade asked for consent [to ask Mr. Chambers additional questions], he had already handed [Mr.] Chambers back his driver's license and the car rental documents, he was the only trooper in the police cruiser with [Mr.] Chambers, in uniform, had not manhandled or threatened him, had not locked him inside the vehicle or physically restrained him in any way, and only used a conversational tone throughout their interaction." (ECF No. 15, at 19–20.) Examining the totality of the circumstances and applying the factors considered Fourth Circuit precedent, the Court concludes that a reasonable person in Mr. Chambers' position would have felt free to terminate the encounter with Trooper Moade, meaning Trooper Moade did not unlawfully extend the scope of the stop.

### a.   Trooper Moade Returned Mr. Chambers' License and Rental Paperwork to him, Indicating that the Encounter had Ended

The United States insists that the last of the factors considered by the Fourth Circuit, that the officer "requested from the defendant . . . some form of official identification [and] promptly returned it," is dispositive.  (ECF No. 15, at 15–16; *see Peters*, 60 F.4th at 863.)  The Court therefore begins its analysis with this factor.

According to the United States, "handing a motorist his license and registration/vehicle-related documents back, and issuing either a ticket or warning for the infraction, is a clear demarcation point between seizure and consensual encounter, and is a clear indication that a traffic stop is over and that a motorist is free to leave." (ECF No. 15, at 15–16.)  That is, the United States argues that once Mr. Chambers received his license and rental paperwork from Trooper Moade, the traffic stop ended, and a consensual *Bostick* encounter immediately followed.

Trooper Moade's interactions with Mr. Chambers lasted approximately seven minutes.[11] Trooper Moade requested Mr. Chambers' license and registration, took possession of his license and rental paperwork, then returned these items after reviewing Mr. Chambers' information. Approximately three more minutes passed while Trooper Moade searched the rental car and placed Mr. Chambers under arrest.  The United States cites three Fourth Circuit cases with facts

---

[11] It is not clear based on the dash cam footage at exactly what time Mr. Chambers first handed Trooper Moade his license and rental paperwork.  When Trooper Moade first pulled Mr. Chambers over, Trooper Moade withdrew his hand from the car and held what appeared to be Mr. Chambers' rental paperwork.  (ECF No. 15-1, at 15:55:09.)  Even if Mr. Chambers handed Trooper Moade his license and rental paperwork the moment Trooper Moade extended his hand into the car when first approaching the Malibu, (ECF No. 15-1, at 15:54:27), Trooper Moade would have held onto those materials for approximately seven minutes, (ECF No. 15-2, at 16:01:18 (capturing Trooper Moade handing the license and rental paperwork back to Mr. Chambers)).

similar to those at issue here, which it asserts control.  (ECF No. 15, at 14–20.)  The Court agrees

that these cases demonstrate that an officer's return of a defendant's license and paperwork

indicates that a traffic stop has ended, but it disagrees with the United States that these cases

*alone* are dispositive.

First, in *United States v. Rusher*, a trooper pulled the defendant over, requested his

driver's license, and asked the defendant to accompany him to his patrol vehicle.  966 F.2d 868,

872 (4th Cir. 1992).  The trooper returned the defendant's license, provided him with a warning,

and told the defendant he was "free to go."  *Id.*  The trooper then asked whether the defendant

was transporting any illegal contraband.  *Id.*  The Fourth Circuit determined that the trooper did

not extend the scope of the stop by asking the defendant whether he was transporting any illegal

contraband because, by returning the defendant's license, the trooper ended the stop and initiated

a consensual *Bostick* encounter.  *Id.* at 877.

Similarly, in *United States v. Lattimore*, a trooper pulled the defendant over, requested

the defendant's driver's license, and asked the defendant to accompany him to his patrol vehicle.

87 F.3d 647, 649 (4th Cir. 1996).  "After issuing the citations and returning Lattimore's driver's

license, and as Lattimore prepared to exit the patrol vehicle, [the trooper] asked him whether

there were any narcotics or contraband in his automobile."  *Id.*  The Fourth Circuit again

concluded that the trooper did not impermissibly extend the scope of the traffic stop because he

"did not question Lattimore concerning the presence of narcotics . . . until after the officer had

issued the citations and returned Lattimore's driver's license, *indicating that all business with*

*Lattimore was completed and that he was free to leave.*"  *Id.* at 653 (emphasis added) (citing

*Bostick*, 501 U.S. at 438).

Finally, in *United States v. Sullivan*, an officer pulled the defendant over, requested his driver's license and registration, but did not ask the defendant to accompany him to his patrol vehicle. 138 F.3d 126, 129 (4th Cir. 1998). Instead, the officer remained outside of the defendant's vehicle and asked another officer to enter the defendant's information into law enforcement databases. *Id.* After the other officer completed a computer check, the first officer returned the defendant's license and registration, then asked the defendant if he was transporting anything illegal. *Id.* Citing *Bostick*, *Rusher*, and *Lattimore*, the Fourth Circuit found that the officer did not extend the stop by asking additional questions because he "did not question Sullivan until after he had returned Sullivan's license and registration, thus ending the traffic stop and affording Sullivan the right to depart." *Id.* at 133.

Taken together, *Rusher*, *Lattimore*, and *Sullivan* support the proposition that an officer's return of a defendant's license and paperwork indicates that a traffic stop ended and a consensual *Bostick* encounter followed. But the United States overstates itself when it argues that "handing a motorist his license and registration/vehicle-related documents back . . . is a *clear* demarcation point between seizure and consensual encounter." (ECF No. 15, at 15–16 (emphasis added).) The Court must examine the *totality* of the circumstances in order to determine whether a consensual encounter occurred. *Bostick*, 501 U.S. at 437. Accordingly, the Court examines the circumstances leading up to Trooper Moade's return of Mr. Chambers' license and rental paperwork by applying the other factors considered by the Fourth Circuit in analyzing whether an individual would feel free to terminate an encounter.

18

### b.    The Limited Number of Officers Present Would Indicate to a Reasonable Person that they Were Free to Terminate the Encounter

First, "the number of officers present," *Peters*, 60 F.4th at 862, weighs in favor of the United States. Only Trooper Moade was present in the car with Mr. Chambers when Trooper Moade asked if he could continue questioning Mr. Chambers. Trooper Moran ultimately arrived at the scene toward the end of the encounter. (ECF No. 24, at 58:5–9.)

Trooper Moade agreed during the suppression hearing that before Trooper Moade asked Mr. Chambers if he could continue questioning, "Mr. Chambers *could have* looked in his sideview mirror and seen that [Trooper Moran] was [behind Trooper Moade's vehicle]." (ECF No. 24, at 46:24–47:14 (emphasis added).) About seven minutes into the stop, Trooper Moade looked out the driver side window. (ECF No. 15-2, at 16:00:58–16:01:01.) Seconds later, a second car pulled in behind Trooper Moade's patrol vehicle. (ECF No. 15-2, at 16:01:09–16:01:12.) And seconds after that, Trooper Moade told Mr. Chambers that he would only receive a warning, handed back Mr. Chambers' paperwork, and began asking additional questions. (ECF No. 15-2, at 16:01:13–16:01:16.) Moreover, Trooper Moran stood immediately outside of the driver's-side door of the patrol vehicle as Trooper Moade exited to start conducting his search of the rental car. (ECF No. 15-2, at 16:01:34.) But even if Trooper Moran was visible to Mr. Chambers when Trooper Moade asked if he could continue questioning, Trooper Moran was obscured behind the patrol vehicle. And at most, Trooper Moran's presence would mean only two officers were present at the scene when he asked Mr. Chambers for permission to continue his questioning. This limited number of officers present did not take away from Mr. Chambers' ability to terminate the encounter. *See Perez-Almeida*, 2019 WL 4023075, at *9 (finding that defendant gave valid consent to a search while interacting with two

uniformed officers because the officers did not intimidate defendant); *cf United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013) (finding no voluntary consent to search when five uniformed officers "dominated" the encounter).

> **c.    Trooper Moade Wore Indicia of his Office that Would Indicate to a Reasonable Person that they Were Not Free to Terminate the Encounter**

Second, Trooper Moade was in uniform and wore a bulletproof vest. (ECF No. 24, at 5:17–21, 38:3–6.)  This factor weighs against the United States, as an officer's uniform can serve as a "show of authority" indicating that an individual is not free to leave an encounter with police. *United States v. Black*, 707 F.3d 531, 538 (4th Cir. 2013) (concluding that defendant had been seized for purposes of the Fourth Amendment in part because the officers around him were uniformed).  Trooper Moade also had a K-9 with him, another indicium of his office, although that dog made no noise or movement during the encounter.

Third, Trooper Moade's firearm was visible. (ECF No. 24, at 37:18–25.)  Again, this factor weighs against the United States, as Trooper Moade's visible weapon could suggest to a reasonable person that they were not free to terminate the encounter.

> **d.    Trooper Moade Never Spoke With Nor Touched Mr. Chambers in Such a Way that a Reasonable Person Would Believe they Were Not Free to Terminate the Encounter**

Fourth, Trooper Moade never touched Mr. Chambers, (ECF No. 24, at 31:7–18), nor "made any attempt to physically block his departure or restrain his movement." *Peters*, 60 F.4th at 862.

Fifth, Trooper Moade never raised his voice at Mr. Chambers nor shouted orders at him, (ECF No. 24, at 30:20–25), "indicating that compliance with the officer's request might be compelled." *Peters*, 60 F.4th at 862–63.

Sixth, there is no evidence before the Court that Trooper Moade informed Mr. Chambers that he "suspected him of illegal activity rather than treating the encounter as routine in nature." *Id.* at 863.

### e. The Totality of the Circumstances Demonstrate that Trooper Moade Did Not Impermissibly Extend the Scope of the Traffic Stop

When Trooper Moade asked Mr. Chambers for permission to continue his questioning, a reasonable person in Mr. Chambers' position would have felt free to terminate the encounter. At most two officers were present when Trooper Moade asked for permission to continue questioning, and Trooper Moade maintained a conversational tone throughout the encounter. Trooper Moade never touched Mr. Chambers nor suggested that he suspected Mr. Chambers of illegal activity. Mr. Chambers agreed to additional questioning *after* Trooper Moade told him he would receive a warning and *while* Trooper Moade handed his license and rental paperwork back. The encounter took placed "on a well-travelled highway" during the daytime. *Lattimore*, 87 F.3d at 651. And while Trooper Moade clearly wore a uniform, vest, and firearm, and a K-9 unit sat in his backseat, the totality of the circumstances indicate that a reasonable individual in Mr. Chambers' position would feel free to terminate the encounter. As in *Rusher*, *Lattimore*, and *Sullivan*, Mr. Chambers' receipt of his license and rental paperwork ended the traffic stop and a consensual *Bostick* encounter ensued.

To be sure, Mr. Chambers' encounter with Trooper Moade involved factual differences from *Rusher*, *Lattimore*, and *Sullivan* relevant to an analysis of the propriety of Trooper Moade's questioning. For example, unlike in *Lattimore*, *Rusher*, and *Sullivan*, when Mr. Chambers entered Trooper Moade's patrol vehicle, a K-9 unit sat in its backseat, (ECF No. 24, at 46:15–20), which might have served as an additional "show of authority" deterring Mr. Chambers from

refusing to answer Troper Moade's additional questions. Moreover, Trooper Moade asked Mr. Chambers for permission to continue questioning *while* returning Mr. Chambers' license and paperwork. When Trooper Moade asked, "do you mind if I ask you a couple more questions?", he still held Mr. Chambers' license and paperwork in his hands. (ECF No. 15-2, at 16:01:16.) Mr. Chambers responded "sure" only as he took his materials from Trooper Moade. (ECF No. 15-2, at 16:01:18.) In *Rusher, Lattimore,* and *Sullivan,*[12] the officers asked for permission to continue questioning after returning the defendants' licenses and paperwork.

Neither of these factual distinctions upend the Court's conclusion that when Trooper Moade asked Mr. Chambers for permission to continue questioning, a consensual *Bostick* encounter took place.[13] Even if the presence of a K-9 enhances an officer's show of authority, the totality of the circumstances demonstrate that Mr. Chambers' consent to answer additional questions was indeed consensual. Trooper Moade never made use of the K-9 unit, nor directed Mr. Chambers' attention to it. And the fact that Trooper Moade's request came while he still

---

[12] Mr. Chambers suggests these three cases are distinguishable because, "[c]ontrary to the case law cited by the government which indicated that an encounter turned into a consensual encounter when the person was told he was free to leave, Mr. Chambers was never told that he was free to leave." (ECF No. 18, at 3.) Mr. Chambers is correct that in *Rusher,* the trooper told the defendant he was "free to go." *Rusher,* 966 F.2d at 872. But there is no indication that the same occurred in *Lattimore* or *Sullivan,* and in both of those cases, the Fourth Circuit affirmed the legality of the officer's continued questioning.

[13] Indeed, there are additional factual distinctions between this case and those cited by the United States that weigh against Mr. Chambers. For example, in *Lattimore,* the trooper asked the defendant for permission to ask additional questions "as Lattimore prepared to exit the patrol vehicle." *Lattimore,* 87 F.3d at 649. That is, the officer *prevented* the defendant from leaving before asking for consent to continue with questioning. Trooper Moade did not do the same here, but rather asked for permission to continue his questioning as he handed back Mr. Chambers' license and rental paperwork. *See also United States v. Porter,* 49 F. App'x 438, 442 (4th Cir. 2002) (finding that defendant's consent to a search was lawful even where the officer asked for consent after stopping defendant by saying, "before you go").

22

held Mr. Chambers' license and paperwork also does not change the Court's calculus.[14]  Trooper Moade retained a conversational tone when he asked Mr. Chambers for permission to continue questioning and took no other steps to coerce Mr. Chambers into agreeing.

Trooper Moade's request to continue with his questioning did not unlawfully extend the scope of the stop.  But Mr. Chambers argues that even if Trooper Moade's request to continue questioning was lawful, he never gave valid consent to the subsequent search of the rental car. This is not so.

### C.   Mr. Chambers Consented to the Search of the Rental Car

After asking Mr. Chambers questions regarding whether he was transporting illegal contraband, Trooper Moade also asked if he could search Mr. Chambers' car.  Mr. Chambers responded, "sure."  (ECF No. 15-2, at 16:01:29–16:01:31.)  Mr. Chambers argues that his consent was not valid.  Rather, Mr. Chambers contends that "he was merely acquiescing to the trooper's continued show of authority that never became a consensual encounter." (ECF No. 14, at 15.)

Examining the totality of the circumstances, Mr. Chambers' consent was valid.  Nothing regarding Mr. Chambers' characteristics suggests that he was susceptible to coercion, and

---

[14] Mr. Chambers cites *United States v. Bowman* for the proposition that "[a] lawful traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission.'"  884 F.3d at 209 (citation omitted).  In *Bowman*, the officer asked the defendant to accompany him to his patrol vehicle, requested (and received) consent to ask questions unrelated to the stop, then asked the defendant to remain in the patrol vehicle while the officer questioned the defendant's passenger.  When the officer returned to the patrol vehicle, the defendant expressly refused to provide consent to a search of his car, at which point the officer utilized a K-9 unit and then searched the car.  *Id.* at 205–07.  While *Bowman* accurately states the law regarding the permissible extension of a traffic stop, that case is factually distinguishable from Mr. Chambers' case.  Unlike in *Bowman*, Trooper Moade asked for *and received* Mr. Chambers' oral consent to search the rental car without delay.

nothing about the manner in which Trooper Moade requested consent to conduct the search limited Mr. Chambers' ability to refuse consent.

### 1.    Legal Standard:  Consent to Searches

When the United States asserts that a search was valid based on consent, the government must show "that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citation omitted).  "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).  Indeed, in its analysis of whether consent was "freely and voluntarily given," a court must look to "the totality of the circumstances" under a fact-based determination. *Lattimore*, 87 F.3d at 650.  The United States bears the burden of proving, by a preponderance of the evidence, that it obtained a "knowing and voluntary" consent to a search. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980); *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007).

In evaluating the totality of the circumstances, courts may consider the "characteristics of the accused," including "age, maturity, education, intelligence, and experience" with the criminal justice system, and the "conditions under which the consent to search was given, 'such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter.'" *Lattimore*, 87 F.3d at 650 (citations omitted).  Courts may also look to whether the accused knew he or she had the right to refuse consent, but that factor is not dispositive. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001); *see also Schneckloth*, 412 U.S. at 231 (rejecting any proposed requirement of advising a subject of his or her right to refuse consent before eliciting such consent).

### 2.    The Totality of the Circumstances Indicate that Mr. Chambers Gave Valid Consent to the Search

Mr. Chambers expressly consented to the search. (ECF No. 15-2, at 16:01:29–16:01:31.) Mr. Chambers insists that "he was merely acquiescing to the trooper's continued show of authority." (ECF No. 14, at 15.) The totality of the circumstances demonstrate that Mr. Chambers freely and voluntarily consented to the search of the rental car.

Mr. Chambers' characteristics suggest his consent was voluntary. He is 45 years old and is employed. (ECF No. 24, at 79:13–22.) In analyzing whether a defendant gave valid consent, the Fourth Circuit has also considered whether the defendant was "a newcomer to the law." *Lattimore*, 87 F.3d at 651 (citation omitted). While Mr. Chambers emigrated to the United States from Jamaica in 2019, Mr. Chambers did not demonstrate any difficulty in speaking English nor in understanding Trooper Moade's questions. (ECF No. 24, at 27:8–29:1.) And Mr. Chambers asked Trooper Moade questions regarding what the appropriate distance between cars on a highway should be, suggesting he had some understanding of the law. (ECF No. 15-2, at 15:57:43–15:58:04 (capturing Mr. Chambers asking Trooper Moade whether he was correct that one driver should remain at least 100 feet away from another on the road).)

The conditions under which Mr. Chambers consented do not suggest he was operating under any coercion or duress. Trooper Moade spoke to Mr. Chambers in a conversational tone. He never touched nor restrained Mr. Chambers. Trooper Moade never threatened Mr. Chambers nor reached for his weapon. (ECF No. 24, at 30:20–31:18.) Mr. Chambers felt free to ask questions and initiate conversation himself.

Mr. Chambers responds that the "police presence throughout the encounter" suggests that Mr. Chambers' consent was not voluntary. (ECF No. 18, at 7.) But as discussed above, at most two officers were present when Mr. Chambers consented to the search. While it appears that

Trooper Moran arrived at the scene shortly before Trooper Moade asked Mr. Chambers for permission to continue his questioning, it is not clear whether Mr. Chambers was aware Trooper Moran had arrived.  Only when Trooper Moade exited the patrol vehicle to begin the search did Trooper Moran step into clear view and introduce himself to Mr. Chambers.  (ECF No. 15-2, at 16:01:34.)  Mr. Chambers sat with Trooper Moran for approximately three minutes before Trooper Moade placed him under arrest, during which time the two conversed normally.  And Trooper Moran asked Mr. Chambers for permission to look over Mr. Chambers' rental paperwork, which Mr. Chambers allowed.  Contrary to his assertion, Mr. Chambers was not subject to "a police-dominated atmosphere, where there were uniformed, armed troopers outside of the trooper's car during the initial encounter and conversation."  (ECF No. 18, at 7.)  Trooper Moran and Mr. Chambers also conversed in a polite tone.  Trooper Moran asked to see Mr. Chambers' papers and, although he stated that Mr. Chambers was not an authorized driver of the car, returned the papers without saying more.  Both Mr. Chambers and Trooper Moran had a clear view of Trooper Moade's ongoing search.

Mr. Chambers also contends that his consent was not voluntary because he "was never told he could deny consent to search the car."  (ECF No. 18, at 7.)  While it is true that Trooper Moade never informed Mr. Chambers that he could refuse to consent to the search, the Fourth Circuit has found that this fact is not dispositive.  "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary."  *Lattimore*, 87 F.3d at 650 (citing *Schneckloth*, 412 U.S. at 248).  Because the totality of the circumstances otherwise supports the Court's conclusion that Mr.

Chambers' consent was voluntary, Trooper Moade's failure to inform Mr. Chambers of his right to refuse consent does not alter that conclusion.

The Fourth Circuit has found voluntary consent to a search in factual circumstances similar to those at issue here. In *Lattimore*, the Fourth Circuit found that the defendant, who gave oral and written consent to a search after accompanying an officer to sit in their patrol vehicle, was 29 years old, was employed, and did not experience "an environment that was coercive or intimidating." *Lattimore*, 87 F.3d at 651. The Fourth Circuit came to the same conclusion on similar facts in *Rusher*. 966 F.2d at 877.[15]

Examining the totality of the circumstances, the Court concludes that Mr. Chambers' consent was voluntary.

## IV. Conclusion

At base, Mr. Chambers asks this Court to rule that once the purpose of the traffic stop is complete, an officer should not be allowed to ask any questions about unrelated conduct. As demonstrated by the cases governing this Motion, both Supreme Court and Fourth Circuit law require a finding otherwise. The Court will deny the Motion. (ECF No. 14.) Trooper Moade

---

[15] In *Rusher* and *Lattimore*, and unlike in the present case, the officers requested permission to search the defendants' cars orally *and* had each defendant sign a written consent form prior to conducting a search of the cars. *Rusher*, 966 F.2d at 872; *Lattimore*, 87 F.3d at 649–50. In both cases, the Fourth Circuit determined that the defendants gave valid consent to a search of their cars.

That Mr. Chambers did not sign a written consent form does not change the Court's similar determination here. Whether a defendant gave valid consent to a search does not depend entirely on whether he or she provided written or oral consent. Indeed, in *Lattimore*, the Fourth Circuit noted that even if the defendant "had refused to sign the written consent form, [the officer] would have been justified in searching the vehicle *under the authority of the oral consent*." *Lattimore*, 87 F.3d at 651 (emphasis added). As stated above, the test of Mr. Chambers' consent considers the totality of the circumstances, and those circumstances support a finding that Mr. Chambers' oral consent was valid.

had probable cause to initiate the traffic stop and did not unlawfully extend the scope of that stop. Trooper Moade obtained lawful consent to search Mr. Chambers' car. As a result, the Court will not suppress the fruits of that search.

An appropriate Order shall issue.

Date: 2/10/26
Richmond, Virginia

_____
/s/
M. Hannah Lauck
Chief United States District Judge